## James Egan v. Edward S. Grece et al.

79  629
118  180

*Estates of deceased persons—Sale of real estate—License—Evidence
—Fraud—Laches—Statute of limitations.*

1. A husband died in 1851, willing to his wife one-third of his
estate for her natural life, and the remainder to his four chil-
dren. The widow acted as executrix until her marriage, when
she resigned, and the administration of the estate was com-
pleted by her co-executor. In 1854, one-third of the remaining
estate, a sale having been made of certain lands to pay debts,
was set off to the widow. In 1855, the executors petitioned
for license to sell sufficient of the real estate to pay debts and
expenses of administration. The petition was sufficient to
confer jurisdiction, and referred to the account of the widow
for the care and maintenance of the minor children of the
deceased, which was submitted for examination and determi-
nation. All of the remaining steps were regular, and the oath,
bond, and report of sale of the executors recited the granting
of an order or license to sell. Among the bidders at the sale
was the widow, to whom six acres of land were sold at its
*then* fair value, and the usual executor's deed was executed to
her, containing the same recitals. She immediately fenced the
land, and held exclusive and adverse possession thereof until
her death, in 1887.

In August, 1856, the executors' final account was allowed,
one item of which was for the payment to the widow of the
account hereinbefore referred to. Partition was then made of
the remaining estate among the heirs. In 1860, the widow
quitclaimed the six acres to her sister, without consideration,
and in 1872 her sister reconveyed it to her by the same kind
of a deed, also without consideration.

Soon after the widow's death, two of the heirs, who were
children of the husband by a former wife, quitclaimed an
undivided half of their interest in the land, in consideration
that the grantee should institute legal proceeding for its recov-
ery; whereupon the second husband, to whom the widow had
devised the land, filed a bill to quiet his title. On the hearing
of this suit the sale to the widow was attacked as illegal,
because,—

  *a*—No license to sell was found in the probate court records.
  *b*—The proceedings to sell were fraudulently instituted, and

the widow fraudulently concealed her title, and misrepresented
the character of her possession.

*c*—At the time of such sale she was guardian of her and the·
testator's minor daughter.

The testimony taken on the hearing showed that, during the·
years when the estate was being administered, the probate
records were carelessly kept, and that the papers relating to·
the estate in question were fastened together with ordinary pins,
which had often been removed and replaced. A blank space
was found in the record book at the place where the order
or license to sell, if granted, would naturally have been
recorded, large enough for that purpose. Testimony was also·
introduced of the statements of the widow to the effect that
she was going to use the land as long as she lived, and then it·
would go to the heirs. The executors and judge of probate·
were all dead at the time of the hearing.

In passing upon the case the Court held:

*a*—The recitals in the oath, bond, report of sale, and deed,
in the absence of testimony to the contrary, are conclusive·
proof of the granting of the order or license to sell.

*b*—As against the living, proof of fraud must be clear and
convincing. But when charges of corrupt, fraudulent, and
criminal conduct are made against the dead, who have occu-
pied positions of trust, and whose acts have been authorized
and confirmed by a court of competent jurisdiction, the proof
must be so clear and convincing as to satisfy every reasonable·
mind.

*c*—The statement in the petition that the executors submitted
the account of the widow for the board and maintenance of·
the minor children did not void the proceedings, nor is it any
evidence of fraud *(Norman v. Olney*, 64 Mich. 553), but, on
the contrary, shows the intention of the executors to submit all
matters to the court.

*d*—The statements of the widow, if made, fail to sustain the
claim that she concealed the character of her title and pos-
session from the heirs, or that she made any false representa-
tions in that regard; and if they rested upon the supposition
or belief that somehow, at her death, the land would revert or
be given to them, the record fails to show that the widow was·
responsible for it.

*e*—No one but the minor daughter, as to whom, alone, the
widow held fiduciary relations at time of the sale, can question
the deed on the ground that she was then her guardian.
Besides, such deeds are not absolutely void, and long acquies-
cence, with a full knowledge of the situation, amounts to a rat-
ification, and bars the right to recover.

*f*—How. Stat. § 6074, which bars any action for the recovery of any estate sold by an executor, by any heir or other person claiming under the testator or interstate, unless commenced in five years next after the sale, defeats the claim of the defendants; and this would be true, even if the petition and license had been for a sale to pay for the care and maintenance of the minor children; citing *Toll v. Wright,* 37 Mich. 93.

2. The following propositions are summarized from the opinion of Mr. Justice GRANT:

*a*—The recording of an executor's license to sell real estate is not a prerequisite to the sale, nor is its record at any stage of the proceedings necessary to sustain the jurisdiction of the court.

*b*—When an executor's order for the sale of real estate has been lost or destroyed without the fault of those claiming title under the sale, its existence may be shown by any competent testimony.

*c*—Courts have uniformly recognized the fact that the records in probate courts are often carelessly and imperfectly kept, and have uniformly refused to set aside titles of long standing on account of defects in the record.

*d*—How. Stat. § 6076, makes executor's deeds *prima facie* evidence of the regularity of all the anterior proceedings after a possession of ten years thereunder.

*e*—The truth or falsity of the averments in an executor's petition for license to sell real estate is for the determination of the probate court; and it will be presumed that the judge performed his duty, and after a full hearing determined that there were debts and expenses of administration to pay, and that it was necessary to sell real estate to pay them.

*f*—The sufficiency of the testimony adduced in probate court, and of which no record is kept, to sustain the order or decree made, will not be determined by other courts, except on appeal.

Appeal from Wayne. (Brevoort, J.) Argued January 10, 1890. Decided April 11, 1890.

Bill to quiet title. Defendants appeal. Affirmed. The facts are stated in the opinion.

*F. H. Canfield (Alfred Russell,* of counsel), for complainant.

*Moore & Moore (E. F. Conely,* of counsel), for defendants.

GRANT, J.   The bill in this case was filed July 20, 1888, for the purpose of quieting title. Decree was rendered in the court below for complainant, and defendants appeal.

Both parties claim title through Michael Cannane, who died in July, 1851, seized of the land in dispute, and other lands in the immediate vicinity.   He left surviving him a widow and four children, three of whom were the issue of his first marriage, and one the issue of his second marriage.   He left a will bequeathing to his widow one-third of his personal and real estate during her natural life, and the balance to his children in equal shares. Three executors were named in the will,—his widow, Michael Bresnahan, and Thomas Trehy.   The will was probated, and the executors qualified, and all continued to act until the widow married the complainant, in 1855, when she resigned, and the trust was thereafter executed by the other two executors.   Commissioners on claims were appointed November 17, 1851, who subsequently reported an indebtedness of $594.20.   January 17, 1853, the executors filed a petition to sell real estate to pay the debts and expenses of administration.   Decree for that purpose was granted, and certain real estate sold, realizing the sum of $1,236.   August 30, 1853, the executors filed their account, charging themselves with the above amount, and showing its expenditure in the payment of debts and expenses of administration and orders of the court.   November 24, 1854, commissioners set off to the widow one-third part of the estate for her use.

August 15, 1855, the two executors, Trehy and Bresnahan, filed a petition, setting forth that the executors had paid and accounted for all the moneys they had received,

referring to their accounts on file, and that there were debts, liabilities, and expenses of administration due and outstanding amounting to the sum of $1,100, and that future expenses would, according to their information and belief, amount to $500 more. The petition also states that the widow, Mary Cannane had recently married James Egan, had ceased to act as executrix, and they submitted to the court the account of said executrix for the care and maintenance of said minor children, and requested that it might be examined and determined. The prayer of the petition was for the sale of so much of the real estate described therein as would be sufficient to pay the debts and liabilities of said estate and expenses of administration. No fault is found with the form of the petition. It contained all the averments necessary to give the court jurisdiction. August 16, 1855, the court made an order fixing September 29 next as the day for the hearing of said petition. No record was made by the probate judge of the hearing, nor of the issuing of the license to sell.

Notice of hearing was duly published, and proof thereof filed. October 27, 1855, the executors executed the affidavit and bond required by statute before making the sale, both of which were executed before the judge of probate, and filed with him, and the bond approved. November 2, 1855, notice of sale to take place December 18, 1855, was duly published and posted, and proof thereof was subsequently filed. An auctioneer was employed to make the sale. Several bidders were present, and different lots were sold to different persons. Mrs. Mary Egan purchased the land in question, being the highest bidder. The executors filed their report of the sale, January 11, 1856.

The report was approved and confirmed, and deeds ordered to be executed to purchasers. On the same day

the deed was executed by the executors to Mrs. Egan,
and was by her recorded January 23 of the same year.
All these documents recited the license to sell, giving its
date, and the report of sale states that a copy of the
order is attached to the report.

Mrs. Egan immediately fenced this land, being about
six acres, and up to the time of her death continued in
the actual, continued, open, and exclusive possession
thereof. She kept it fenced, rented it for pasturage and
for raising crops, and paid the taxes, amounting in all to
about $2,000. She died February 12, 1887, devising this
land by will to her husband, the complainant.

The executors filed their account, June 2, 1856, in
which they report $866.16 as paid on account allowed
Mary Egan, which amount is composed of several sums,
but what they are for does not appear upon the face of
the account. The balance of the account is composed of
expenses of administration, the payment of one of the
original claims allowed by the commissioners, and a few
small amounts to certain persons, but for what purpose
is not shown. This account was examined and allowed
August 28, 1856. Commissioners were duly appointed to
partition the balance of the real estate among the heirs.
The report of the commissioners was approved and con-
firmed April 23, 1856. They gave to Elizabeth Cannane,
the daughter of Mary, the lots which had been assigned
to her mother by virtue of her right of dower.

September 20, 1860, Mrs. Egan executed a quitclaim
deed to her sister, and had it recorded. This deed was
without consideration. August 14, 1872, her sister
redeeded the land to her by quitclaim deed. This was
done at the request of Mrs. Egan, and without considera-
tion. Her sister testifies that Mrs. Egan gave no reason
for making the deed to her or for wanting a deed back.
On cross-examination, Mr. Egan testifies that he was the

cause of the making of the deed by his wife to her sister; that he advised her to do it because he was going away, and somebody might put a false mortgage on the property; that a certain man had played the same thing upon them years before.

In December, 1887, Simon Cannane and Mary Ann Dacey, two of the heirs of Michael Cannane, executed quitclaim deeds to defendant Edward S. Grece, an attorney at law, in consideration that he should institute legal proceedings to recover the property, conveying to him the undivided one-half interest of each of said parties in the land. The other two heirs declined to join in the proceedings. Mrs. Egan at the time of the purchase by her was the guardian of her daughter Elizabeth, who was born in 1847. Of the other children, one was born in 1836, one in 1838, and one in 1840. The executors and the then judge of probate are all dead. Simon Cannane died shortly before the commencement of this suit.

Evidence was introduced, from those who were familiar with the records of the probate court of Wayne county, establishing beyond doubt that during the years covered by this controversy they were very loosely and carelessly kept. The papers relating to this estate were fastened together with ordinary pins, which had often been removed and replaced. A blank space is left in the record book at the place where the order or license to sell, if granted, would naturally have been recorded, and the space left is sufficiently large for that purpose.

The only other testimony important to notice relates to statements claimed to have been made by Mrs. Egan, the two executors, Trehy and Bresnahan, and Simon Cannane. One witness, who married the daughter of executor Trehy, testifies that he heard conversations between Trehy, Bresnahan, and Mrs. Egan about this land; that he under-

stood from their talk that it was to be given back to the heirs when Mrs. Egan died; that the general understanding was that it was to revert to them; that he overheard Mr. Trehy say to Mrs. Egan,—

"You will never bring a cent to the grave, nor you wont bring the place to the grave with you;"—

That she replied—

"No; let them have it as they please when I die, but I am going to use it as long as I live."

Lizzie Cannane, a daughter of Simon, testifies that she once heard a conversation between Mrs. Egan and her father; that Mrs. Egan said she wanted to know if he was coming round about the property again; that he said,—

"Yes; who has a better right to it than what I have?"

That she replied,—

"I am not dead yet."

Johanna Cannane, widow of Simon, testifies that Simon often wanted to borrow money of Mrs. Egan; that she refused to loan it to him, and told him to keep quiet; that after her death he would be quite comfortable; that she was obliged to hold onto this six acres until after her death. Testimony was given by some of the above-named witnesses tending to show statements made by Simon Cannane, Trehy, and Bresnahan as to their understandings or suppositions in regard to this property. It is unnecessary to state this testimony, for reasons hereinafter given.

One other fact is regarded by defendants' counsel as important, viz., that August 6, 1853, Mrs. Egan, then Mrs. Cannane, presented a claim to the probate court for an allowance for the care and maintenance of the children, which was disallowed

Defendants ask to have complainant's title declared void, because:

1. No license to sell appears in the records of the probate court.

2. The proceedings to sell were fraudulently instituted, and that Mrs. Egan fraudulently concealed her title, and misrepresented the character of her possession.

3. At the date of the sale Mrs. Egan was the guardian of her daughter, Elizabeth Cannane.

1. The recitals in the affidavit, the bond, the report of sale, and the deed, in the absence of testimony to the contrary, are conclusive proof of the existence of the order or license to sell. They can leave no reasonable doubt in the mind of any one that due hearing was had upon the petition, and that license was duly granted. The recording of the license is not a prerequisite to the sale, nor is its record at any stage of the proceedings necessary to sustain the jurisdiction of the court. The law does not require it to be recorded. The law only requires that the court shall make an order of sale, when satisfied of its necessity, after a full hearing. When such order is lost or destroyed without the fault of those claiming title under the sale, its existence may be shown by any competent evidence. Courts have uniformly recognized the fact that the records in probate courts are often carelessly and imperfectly kept, and have uniformly refused to set aside titles of long standing on account of defects in the record.

How. Stat. § 6076, makes the deed in this case *prima facie* evidence of the regularity of the proceedings, from and including the application to sell such lands or premises, to the date and execution of the deed, inclusive. This statute makes the deeds of executors *prima facie* evidence of such regularity after a possession of ten years thereunder. The object of this statute was to afford protection to purchasers against the loss or destruction of

papers and records in the probate court upon which their titles are founded, and to require those who assail such titles to produce positive proof of such fatal irregularity as renders them void. The burden of proof was on the defendants. Their only evidence upon this point consisted of the records above set forth.

2. The defendants have failed to make out a case of fraud. Trehy was the uncle and guardian of the children of Michael Cannane by his first wife. Certainly no object existed for him to defraud his wards. Bresnahan was the father of Mrs. Egan, but we cannot infer from that fact alone that he was ready to commit fraud for the benefit of his daughter. There is no evidence or claim that either Bresnahan or Trehy profited or was to profit by the transaction. From the records it appears that Bresnahan received nothing for his services, and that Trehy received $15. Mr. O'Flynn, an ex-judge of probate of that court, was the attorney for the executors, and from the very nature of the case must have been familiar with all the circumstances and the condition of the estate. He is dead. The sale was open and fair. Several bidders were present. The land brought its fair value. There is no evidence that there was then any prospect of an immediate rise in value, or that the land did rise in value for many years. The executors accounted for all the money received, and their account was allowed by the probate judge, J. H. Bagg, who had been the judge during all the time of the settlement of the estate.

Upon this record the defendants' counsel claim that the executors and Mrs. Egan deliberately entered into a conspiracy to defraud the heirs of Michael Cannane, and that they under oath made a false and fraudulent petition for that purpose. If this were true, we should then be forced to the conclusion that Mr. O'Flynn was *particeps criminis*, and that the judge of probate was either grossly

negligent of his important duty, or that he purposely assisted the consummation of the fraud. As against the living, proof of fraud must be clear and convincing. But when charges of corrupt, fraudulent, and criminal conduct are made against the dead, who have occupied positions of trust, and whose acts have been authorized and confirmed by a court of competent jurisdiction, the proof must be so clear and convincing as to satisfy every reasonable mind. The averments in the petition were sufficient to give the court jurisdiction. Their truth or falsity was for the determination of the court. It will be presumed that the judge performed his duty, and that after a full hearing he determined that there were debts and expenses of administration to pay, and that it was necessary to sell real estate to pay them. Other courts, except on appeal, will not assume to determine whether or not the testimony adduced before that court, and of which no record is kept, is sufficient to sustain the order or decree. *Morford v. Dieffenbacker,* 54 Mich. 593 (20 N. W. Rep. 600).

The statement in the petition that the executors submit to the court the account of Mrs. Egan for the board and maintenance of the minor children, and request it to be examined and determined, does not render the proceedings void, nor is it any evidence of fraud. *Norman v. Olney,* 64 Mich. 553 (31 N. W. Rep. 555). On the contrary, it shows the intention of the petitioners to submit all matters to the court. The fact that the account was afterwards allowed has no tendency to prove fraud. The children up to that time had lived with her, and been cared for by her. There was no evidence or claim that she was not justly entitled to it. No fraud can be based upon the fact that she took this method to obtain her just dues. She presented the claim to the same court in which the guardians might have presented

it. The claim itself must have been tainted with fraud; otherwise its allowance has no tendency to sustain the charge. The testimony, if true, of statements made by Mrs. Egan, fails to sustain the claim that she concealed the character of her title and possession from the heirs, or that she made any false representations in that regard. If Simon and Johanna rested upon the supposition or belief that somehow, at her death, the land would revert or be given to the heirs, the record fails to show that Mrs. Egan was responsible for it. But it may fairly be inferred from this testimony that Simon, at least, was fully aware of the character of Mrs. Egan's title and claim.

Evidence of the statements or understandings of Simon, Trehy, and Bresnahan is incompetent. If living, the testimony would be inadmissible as hearsay. It is not made competent by their deaths. It would have been proper for the court below to have excluded it when offered. Whatever may have been the object of Mrs. Egan in deeding the land to her sister, it is not, unexplained, a badge of fraud. It was a quitclaim deed, and showed upon its face that it was made without a valuable consideration. It was an assertion that she owned the title, and had the right to convey it. For 16 years her sister appeared upon the record as the owner in fee of the land, and no effort was made by the heirs to set it aside. It would be unjust, if not cruel, to assume, in the absence of proof, that she was acting from wicked and dishonest motives, when she cannot speak for herself.

3. The defendants are not in position to question the validity of the deed on the ground that Mrs. Egan was at the time the guardian of her daughter Elizabeth. She occupied no fiduciary relation to the other children of Michael Cannane. She stood towards them and their

interests in no other or different position than would any stranger bidding at the sale. She owed them no duty. Her daughter is the only one who can now raise this question, and this she expressly refuses to do. But such deeds are not absolutely void. Long acquiescence, with a full knowledge of the situation, amounts to a ratification, and bars the right to recover. Mary Ann became of age in 1857, and Simon in 1861. She slept upon her rights full 30 years, and he full 26 years. During all this time Mrs. Egan's claim was hostile, her possession open, notorious, and exclusive, and her title upon record. They are therefore now estopped from questioning the title.

4. The statute of limitations defeats the right of recovery on the part of the defendants. How. Stat. § 6074. And this would be true, even if the petition and license had been for a sale to pay for the care and maintenance of the children. *Toll v. Wright*, 37 Mich. 93. Thirty-three years elapsed before the validity of this title was questioned, or any charge of fraud was made. Mrs. Egan died February 12, 1887. A year and a half more elapsed before any of Michael Cannane's heirs are found in court asserting any claim to this property, and then only when brought into court by the bill of complainant to quiet title. The executors, the attorney, the judge, all who were familiar with the facts and circumstances of the transaction, are many years dead. The characters of the dead are assailed. A title of long standing is attacked and sought to be set aside, mainly, upon the parol evidence and uncertain recollections of interested parties. These dead, if living, might explain to the satisfaction of any one all the circumstances upon which the defendants now base their charge of fraud. A more appropriate case for the application of the wise and salutary statutes of repose cannot well be imagined.

79 MICH.—41.

The decree of the court below must be affirmed, with costs.

The other Justices concurred.